▷

Supreme Court of Tennessee,
at Jackson.
QUALITY AUTO PARTS CO., INC., Plaintiff
(non-appealing party),
v.
BLUFF CITY BUICK CO., INC., Milton Schaeffer, and
Joseph Schaeffer, Counter-
Defendants/Appellants,
v.
Whitson KIMBROW, Counter-Plaintiff/Appellee.

March 7, 1994.
Rehearing Denied May 16, 1994.

Automobile parts company filed action against automobile sales company to collect unpaid account, sales company filed third-party action against its parts manager alleging that he conspired to create phony invoices from parts company, and parts manager filed counterclaim against sales company for slander. The Law Court, Shelby County, George H. Brown, Jr., dismissed parts manager's counterclaim. Parts manager appealed. The Supreme Court, Anderson, J., held that: (1) discovery rule did not apply to statute of limitations for slander; (2) Consumer Protection Act did not apply to sales company's statements, since they did not criticize or disparage quality of employee's services as parts manager; and (3) parts manager failed to show that sales company committed tort of intentional interference with prospective economic advantage.

Affirmed in part, reversed in part, and dismissed.

West Headnotes

[1] Appeal and Error ⚖916(3)
30k916(3) Most Cited Cases
Where trial court held complaint legally insufficient by its failure to state claim, Supreme Court would take as true all well-pleaded, material factual allegations, and would construe complaint liberally in favor of plaintiff. Rules Civ.Proc., Rule 12.02(6).

[2] Limitation of Actions ⚖95(1)
241k95(1) Most Cited Cases

"Discovery rule," that statute of limitations begins to run when injury is discovered, or in exercise of reasonable care and diligence, injury should have been discovered, responds to unfairness of requiring that plaintiff sue to vindicate a nonexistent wrong, at time when injury is unknown and unknowable.

[3] Limitation of Actions ⚖1
241k1 Most Cited Cases
Policy reason for development of statutes of limitations is to ensure fairness to defendant by preventing undue delay in bringing suits on claims, and by preserving evidence so that facts are not obscured by lack of time or defective memory or death of witness.

[4] Limitation of Actions ⚖95(1)
241k95(1) Most Cited Cases
When determining whether to apply discovery rule, Supreme Court considers specific statutory language at issue, and balances policies furthered by application of discovery rule against legitimate policies upon which statutes of limitations are based.

[5] Libel and Slander ⚖1
237k1 Most Cited Cases
"Libel" action involves written defamation and "slander" action involves spoken defamation.

[6] Libel and Slander ⚖1
237k1 Most Cited Cases
Basis for action for defamation, whether it be slander or libel, is that defamation has resulted in injury to person's character and reputation.

[7] Libel and Slander ⚖23.1
237k23.1 Most Cited Cases
"Publication" is term of art meaning communication of defamatory matter to a third person.

[8] Libel and Slander ⚖24
237k24 Most Cited Cases
In the case of slander, publication occurs when defamatory matter is spoken.

[9] Limitation of Actions ⚖95(6)
241k95(6) Most Cited Cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Discovery rule does not apply to statute of limitations for slander; injury to character and reputation upon which slander action is based develops and is complete at the moment the slanderous words are uttered, and policies of preventing stale claims and preserving evidence, upon which statutes of limitations are based, are especially applicable to slander actions because of intangible nature of the evidence and the injury.

**[10] Consumer Protection ⚞6**
92Hk6 Most Cited Cases
Assuming that Consumer Protection Act could apply in employer-employee context, and assuming that automobile sales company made false statements that employee was stealing from company as alleged in employee's complaint, Act did not apply to employee since statements did not criticize or disparage quality of employee's services as parts manager, but merely reflected on his integrity. T.C.A. § 47-18-104(b)(8).

**[11] Torts ⚞12**
379k12 Most Cited Cases
To establish statutory or common law action for unlawful inducement of breach of contract, plaintiff must prove that there was legal contract of which wrongdoer was aware, that wrongdoer maliciously intended to induce breach, and that as a proximate result of wrongdoer's actions, breach occurred that resulted in damages to plaintiff. T.C.A. § 47-50-109.

**[12] Labor and Employment ⚞900**
231Hk900 Most Cited Cases
(Formerly 379k10(3))
Even if Tennessee courts were to recognize tort of intentional interference with prospective economic advantage, employee of automobile sales company failed to show that company committed the tort by making statements which interfered with his future employment as parts manager; employee failed to allege existence of specific prospective employment relationship or company's knowledge of such relationship.

**\*819** Gail O. Mathes, Memphis, for appellants.

Joseph Michael Cook, Memphis (Jim Waide, of counsel), Tupelo, MS, for appellee.

*OPINION*

ANDERSON, Justice.

In this appeal, we are asked to determine whether the discovery rule applies to the six-month statute of limitations for slander, and whether the Tennessee Consumer Protection Act is applicable. We also consider whether a claim has been stated for the tort of intentional interference with prospective economic advantage. For the reasons stated below, we conclude that the discovery rule does not apply to the slander statute of limitations because of the nature of slander and the explicit language of the statute. We also agree that the Tennessee Consumer Protection Act is not applicable and that a claim has not been stated for the tort of intentional interference with prospective economic advantage. Accordingly, we do not address the question of whether the tort should be recognized in this case.

*BACKGROUND*

This action began when Quality Auto Parts Co., Inc. ("Quality"), filed suit against Bluff City Buick Company, Inc. ("Bluff City") to collect an unpaid account for auto parts. Bluff City responded by filing a third party action against their own employee, Whitson Kimbrow, Jr., and Quality's president, James M. Williams. The action alleged that Williams created "phony" parts invoices from Quality, that were paid by Kimbrow, as parts manager for Bluff City, with Williams and Kimbrow splitting the profits from the conspiracy.

Kimbrow denied the charges and filed a counterclaim for slander, alleging that representatives of Bluff City made defamatory statements about him, including calling him a "thief" and saying that he was "stealing from the company." Kimbrow learned of one statement three and one-half months after it was made, another approximately five months after it was made, and the rest within ten months. All agree the slander action was filed more than six months after "the words were uttered."

Kimbrow's counter-claim also maintained that the statements were a "disparaging of his services or business" and, therefore, violated **\*820** the Tennessee Consumer Protection Act, Tenn.Code Ann. § 47-18-104(b)(8) (1988 & Supp.1993). In addition, Kimbrow contended that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.


statements were made with the deliberate intent to interfere with his future business as a parts manager, and therefore, constituted the common-law tort of intentional interference with prospective business relations.

Bluff City filed a motion to dismiss Kimbrow's counter-claim, and the trial court dismissed the counter-claim with prejudice. The trial court concluded that the slander action was time-barred by the expiration of the six-month statute of limitations; [FN1] that the consumer protection statute does not apply to an employer/employee relationship; and that Tennessee does not recognize the tort of intentional interference with prospective business relations.

FN1. Tenn.Code Ann. § 28-3-103 (1980).

Kimbrow appealed. The Court of Appeals affirmed the trial court's decision dismissing the consumer protection claim and the tort of intentional interference with prospective business relations, but held the slander claim was not time-barred. The Court of Appeals concluded that the six-month statute of limitations did not begin to run until Kimbrow discovered the injury.

[1] Because the trial court has held Kimbrow's complaint legally insufficient by its failure to state a claim, we will take as true all well-pleaded, material factual allegations, and we will construe the complaint liberally in favor of the plaintiff in our discussion of the issues which follows. *Dobbs v. Guenther*, 846 S.W.2d 270 (Tenn.App.1992).

### STATUTE OF LIMITATIONS

We first consider whether the discovery rule applies to the six month statute of limitations for slander. Essential to our analysis is an examination of the origin and purpose of the discovery rule in Tennessee, as well as the history and development of the law of defamation, specifically slander.

[2] The discovery rule was first announced in *Teeters v. Currey*, 518 S.W.2d 512, 515 (Tenn.1974), a medical malpractice case. It provides that the statute of limitations begins to run when the injury is discovered, or in the exercise of reasonable care and diligence, the injury should have been discovered. The rule responds to the unfairness of "requiring that he [a plaintiff] sue to vindicate a non-existent wrong, at a time when injury is unknown and unknowable." *Id.* at 515. Since its announcement in *Teeters,* the discovery rule has been applied to various tort actions including products liability, legal malpractice, and dental malpractice actions. *Chambers v. Dillow,* 713 S.W.2d 896 (Tenn.1986); *Foster v. Harris,* 633 S.W.2d 304 (Tenn.1982); *McCroskey v. Bryant Air Conditioning Co.,* 524 S.W.2d 487 (Tenn.1975).

[3][4] In contrast to the rationale for the discovery rule are the policy reasons for the development of statutes of limitations to ensure fairness to the defendant by preventing undue delay in bringing suits on claims, and by preserving evidence so that facts are not obscured by the lapse of time or the defective memory or death of a witness. *Potts v. Celotex Corp.,* 796 S.W.2d 678, 681 (Tenn.1990); *Teeters,* 518 S.W.2d at 515; *see generally Developments in the Law: Statutes of Limitations,* 63 Harv.L.Rev. 1176, 1185 (1950). When determining whether to apply the discovery rule, this court considers the specific statutory language at issue, and balances the policies furthered by application of the discovery rule against the legitimate policies upon which statutes of limitations are based. *Potts,* 796 S.W.2d at 684.

[5][6] Also necessary to our decision is an understanding of the development of the law of defamation, which includes both slander and libel. A libel action involves written defamation and a slander action involves spoken defamation. The basis for an action for defamation, whether it be slander or libel, is that the defamation has resulted in an injury to the person's character and reputation. *Little Stores v. Isenberg,* 26 Tenn.App. 357, 172 S.W.2d 13, 16 (1943). Historically, however, a distinction has been drawn between the two types of defamation.

> *821 Libel was criminal in its origin ... while slander was never criminal in itself, and could become so only when the words amounted to some other offense, such as sedition, blasphemy, or a breach of the peace. When the two at last met in the common law courts, they tended to become separate rather than united; and since libel was already established as the greater wrong, greater responsibility attached to it.

*Prosser and Keeton on Torts* § 112 at 785 (West 5th ed.

1984 & Supp.1988) (hereinafter referred to as "Prosser, § _ at __"). In Tennessee, the distinction establishing libel as the greater wrong was said to be "founded in the deliberate malignity displayed by reducing the offensive matter to writing." *Williams v. Karnes,* 23 Tenn. 9, 11 (1843).

The historical distinction discussed above is evident in Tennessee's current statutes of limitations on slander and libel. Actions for slander must "be commenced within six (6) months after the words are uttered," Tenn.Code Ann. § 28-3-103 (1980); while, in contrast, a plaintiff bringing an action for libel has one year from the time "the cause of action accrued." Tenn.Code Ann. § 28-3-104 (1980 and Supp.1993). The difference in the time limitations implicitly recognizes the degree of wrong between the two torts.

[7][8] Other jurisdictions generally hold that a cause of action for defamation, whether libel or slander, accrues and the statute of limitations begins to run on the date of publication of the defamatory material. Publication is a term of art meaning the communication of defamatory matter to a third person. In the case of slander, "publication" occurs when the defamatory matter is spoken. *Little Stores,* 172 S.W.2d at 16; *see also Applewhite v. Memphis State University,* 495 S.W.2d 190, 192-93 (Tenn.1973). Tennessee has codified that general rule in the slander statute of limitations by explicitly providing that the time period begins to run when the slanderous words are uttered.

The great majority of courts in other jurisdictions have held that the discovery rule does not alter the general rule that the time period begins to run when the words are uttered. [FN2] Moreover, in most cases, the courts went even further and declined to apply the discovery rule to "accrual" language in the statute of limitations for slander, as opposed to the more explicit language in the Tennessee slander statute. [FN3]

> FN2. *Gordon v. Fredle,* 206 N.C. 734, 175 S.E. 126 (1934); *Lathrop v. McBride,* 209 Neb. 351, 307 N.W.2d 804, 806 (1981); *Lawrence v. Bauer Pub. & Printing Ltd.,* 78 N.J. 371, 396 A.2d 569, 571 (1979) (Pashman, J., concurring); *Mikaelian v. Drug Abuse Unit,* 501 A.2d 721, 724-25 (R.I.1985); *Clark v. Airesearch Mfg. Co. of Ariz. Inc.,* 138 Ariz. 240, 673 P.2d 984 (App.1983); *Withall v. Capitol Federal Sav. of America,* 155 Ill.App.3d 537, 108 Ill.Dec. 202, 508 N.E.2d 363, 367 (1 Dist.1987); *McGovern v. Cargill, Inc.,* 463 N.W.2d 556 (Minn.App.1990); *Karam v. First American Bank of New York,* 190 A.D.2d 1017, 593 N.Y.S.2d 640, 642 (1993); *Rand v. New York Times Co.,* 75 A.D.2d 417, 430 N.Y.S.2d 271, 275 (1980); *Lyons v. Farmers Ins. Group of Companies,* 67 Ohio App.3d 448, 587 N.E.2d 362, 364 (3 Dist.1990); *Workman v. Rajneesh Foundation Intern.,* 84 Or.App. 226, 733 P.2d 908, 911 (1987); *Brown v. American Broadcasting Co., Inc.,* 704 F.2d 1296 (4th Cir.1983) (applying Virginia law); *Lashlee v. Sumner,* 570 F.2d 107, 108 (6th Cir.1978) (applying Kentucky law); *Wilson v. Retail Credit Co.,* 438 F.2d 1043 (5th Cir.1971) (applying Mississippi law); *Morgan v. Hustler Magazine, Inc.,* 653 F.Supp. 711 (N.D.Ohio 1987); *L. Cohen & Co., Inc. v. Dun & Bradstreet, Inc.,* 629 F.Supp. 1425 (D.Conn.1986); *Rinsley v. Brandt,* 446 F.Supp. 850, 852 (D.Kan.1977); *Heller v. Smither,* 437 F.Supp. 1 (M.D.Tenn.1977) (affirmed without opinion 578 F.2d 1380 (6th Cir.1978); *see generally* Annotation, *Limitation of Actions: Time of Discovery of Defamation as Determining Accrual of Action,* 35 A.L.R.4th 1002 (1985); *but see Hoke v. Paul,* 65 Haw. 478, 653 P.2d 1155 (1982).

> FN3. We also note that the discovery rule has been applied in a limited type of defamation case--cases in which the alleged defamatory statements are published under circumstances in which they are likely to be kept secret, i.e. reports to credit bureaus and letters placed in employment personnel files. *See e.g., Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.,* 61 Ill.2d 129, 334 N.E.2d 160 (1975); *Kittinger v. Boeing Co.,* 21 Wash.App. 484, 585 P.2d 812 (1978); *Manguso v. Oceanside Unified School District,* 88 Cal.App.3d 725, 152 Cal.Rptr. 27 (4th Dist.1979); *White v. Gurnsey,* 48 Or.App. 931, 618 P.2d 975 (1980); *Clark v. Airesearch Mfg. Co. of Ariz., Inc.,* 138 Ariz. 240, 673 P.2d 984

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[9] We conclude that the rationale for declining to apply the discovery rule to defamation statutes of limitations is persuasive. *822 Typical situations in which the discovery rule has been applied involved distinct and usually physical injuries developing long after the defendant's negligent conduct occurred, and after the statute of limitations expired. In contrast, the injury to character and reputation upon which a slander action is based develops and is complete at the moment the slanderous words are uttered. Moreover, the policies upon which statutes of limitations are based, i.e., preventing stale claims and preserving evidence, are especially applicable to slander actions because of the intangible nature of the evidence, spoken words, and of the injury itself, damage to character and reputation. *Kelley v. Rinkle,* 532 S.W.2d 947, 949 (Tex.1976). Finally, as the federal district court recognized in *Heller v. Smither, supra,* the language of Tennessee's slander statute of limitations sets forth "a positive and distinct event that triggers the running of the limitations period--the utterance of the alleged defamatory words." *Id.* at 5.

Based on the foregoing reasoning, we conclude that the discovery rule does not apply to Tennessee's slander statute of limitations; and accordingly, Kimbrow's claim for slander is time barred.

### CONSUMER PROTECTION CLAIM

[10] Next, Kimbrow contends that the statements made by the agents and employees of Bluff City violate the Tennessee Consumer Protection Act, despite the fact that the statements arose in the employer-employee context. Kimbrow says that the false statements alleged in his complaint disparaged his services to such an extent that he has since been unable to get a job as a parts manager. In support of his claim, Kimbrow relies on Tenn.Code Ann. § 47-18-104 (1988 & Supp.1993), which provides in pertinent part:

> **Unfair or deceptive acts prohibited.**--(a) Unfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts or practices and are Class B misdemeanors.
> (b) Without limiting the scope of subsection (a), the following unfair or deceptive acts or practices affecting the conduct of any trade or commerce are declared to be unlawful and in violation of this part:
> ....
> (8) Disparaging the goods, services or business of another by false or misleading representations of fact.

We note that other state courts have concluded, as did the trial court and the Court of Appeals, that consumer protection laws do not apply to disputes arising in the context of employer-employee relationships. *Manning v. Zuckerman,* 388 Mass. 8, 444 N.E.2d 1262 (1983); *Miller v. Fairfield Communities, Inc.,* 299 S.C. 23, 382 S.E.2d 16 (App.1989); *Buie v. Daniel Intern. Corp.,* 56 N.C.App. 445, 289 S.E.2d 118 (1982). We, however, find it unnecessary to reach that issue in this case. Assuming for the sake of argument that the defendants made the false statements alleged in the complaint, the statements did not criticize or disparage the quality of Kimbrow's services as a parts manager, but reflected only upon his integrity. As such, they would not support a claim under Tenn.Code Ann. § 47-18-104(b)(8), assuming it applied. *Crinkley v. Dow Jones and Co.,* 67 Ill.App.3d 869, 24 Ill.Dec. 573, 578-79, 385 N.E.2d 714, 719-20 (1 Dist.1978).

### INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

Lastly, we consider Kimbrow's contention that the Court of Appeals erred by concluding that Tennessee does not recognize the tort of intentional interference with prospective economic advantage.

[11] Tennessee undoubtedly does recognize both a statutory and common law action for unlawful inducement of a breach of contract. Tenn.Code Ann. § 47-50-109 (1988 & Supp.1993); *Polk & Sullivan, Inc. v. United Cities Gas Co.,* 783 S.W.2d 538, 543 (Tenn.1989). In order to establish such a cause of action, a plaintiff must prove that there was a legal contract, of which the wrongdoer was aware, that the wrongdoer maliciously intended to induce a breach, and that as a proximate result of the wrongdoer's actions, a breach occurred that resulted in damages to the plaintiff. *Id.*

*823 In contrast, Tennessee courts have never expressly recognized nor rejected [FN4] the distinct tort of intentional

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

interference with prospective economic advantage although a majority of other jurisdictions have explicitly accepted it as an independent tort. *See generally,* 5 A.L.R.4th 9 (1981); 6 A.L.R.4th 195 (1981); *Prosser,* § 130; 45 Am.Jur.2d, *Interference* § 49 (1969 & Supp.1993).

> FN4. A number of federal courts have assumed that Tennessee would follow the majority of jurisdictions in recognizing the tort. Relief was not granted in any of those cases, however, because the facts did not establish the necessary elements. *Warde v. Kaiser,* 887 F.2d 97, 103 n. 1 (6th Cir.1989); *Unijax Inc. v. Champion Intern., Inc.,* 683 F.2d 678, 687 n. 16 (2nd Cir.1982); *Acuff-Rose Music v. Campbell,* 754 F.Supp. 1150, 1160 (M.D.Tenn.1991); *Cesnik v. Chrysler Corp.,* 490 F.Supp. 859, 870-71 (M.D.Tenn.1980); *but see Chilton Air Cooled Engines v. Omark Indus.,* 721 F.Supp. 151, 156 (M.D.Tenn.1988). *Cf. Taylor v. Nashville Banner Pub. Co.,* 573 S.W.2d 476, 485 (Tenn.App.1978).

Most jurisdictions and commentators agree the tort is composed of the following elements: (1) the existence of a business relationship or expectancy (an existing contract is not required); (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional act of interference; (4) proof that the interference caused the harm sustained; and (5) damage to the plaintiff. *Id.,* 5 A.L.R.4th at § 2[a], p. 16; *see also Crandall Corp. v. Navistar Intern.,* 302 S.C. 265, 395 S.E.2d 179 (1990); *Commodore v. University Mechanical Contr.,* 120 Wash.2d 120, 839 P.2d 314 (1992).

Development of the tort has been parallel to the tort of interference with existing contract. Consequently, most protected "expectancies" have included only fairly specific and certain future contractual relations. Also required has been the ability to ascertain both the lost value and the likelihood that the plaintiff would have received it if the defendant had not interfered. Examples include the prospect of obtaining employment or employees, and the opportunity of obtaining customers. *Prosser,* § 130, at 1006.

In the current action, Kimbrow acknowledges that Tennessee has never expressly recognized the tort of intentional interference with prospective economic advantage, but argues that the tort was implicitly recognized by this Court in the early case of *Hutton v. Watters,* 132 Tenn. 527, 179 S.W. 134, 135 (1915).

In *Hutton,* the plaintiff owned a boarding house whose tenants were students at a nearby school. Angered by the plaintiff's refusal to dismiss a boarder with whom Watters, the school president, had quarrelled, Watters threatened to deprive the students boarding with the plaintiff of certain school benefits unless they left her house. Watters also interfered with the plaintiff's access to potential boarders by delivering similar threats to new arrivals at the train station. The trial court dismissed the case, but the *Hutton* court reversed, holding the allegations stated a claim upon which relief could be granted. No distinction was drawn by the *Hutton* court between those boarders who had an existing contractual relationship and those prospective boarders who never sought accommodations with the plaintiff due to the defendant's threats. Accordingly, it is not clear that the tort of intentional interference with prospective economic advantage was the claim recognized in *Hutton.*

[12] It is clear, however, that the resolution of this case does not require that we recognize or reject the tort of intentional interference with prospective economic advantage. There is nothing in the record to indicate that the counter-plaintiff Kimbrow had sought and been refused employment with any specific person or company. Nor is there any claim that Quality *knew* of any such prospective relationship of employment between Kimbrow and a particular individual or entity. The record contains only Kimbrow's assertion that he has been unable to obtain employment in the Memphis area because of Quality's interference. As Bluff City points out, even if this Court recognized the tort at this time, Kimbrow's claim must fail because his complaint does not allege two essential elements of the tort--(1) the existence of a specific prospective employment relationship and (2) knowledge by Quality of such a relationship. *See Meehan v. Amax Oil & Gas, Inc.,* 796 F.Supp. 461, 467 (D.Colo.1992).

*824 We conclude that the question of whether Tennessee recognizes the tort of intentional interference with prospective economic advantage should be postponed to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

another day when we are squarely presented with a case in which all of the elements of the tort have been alleged or otherwise established. Accordingly, the Court of Appeals' judgment dismissing Kimbrow's claim is affirmed upon the separate grounds stated.

## *CONCLUSION*

For the reasons stated above, we affirm the Court of Appeals' judgment dismissing Kimbrow's claims for violation of the Tennessee Consumer Protection Act and the tort of intentional interference with prospective economic advantage. The Court of Appeals' judgment applying the discovery rule to the slander statute of limitations is reversed. Costs of this appeal are taxed to the counter-plaintiff, Whitson Kimbrow.

REID, C.J., and DROWOTA and O'BRIEN, JJ., concur.

DAUGHTREY, J., not participating.

## *ORDER ON PETITION FOR REHEARING*

PER CURIAM.

A petition for rehearing has been filed in this cause by the counter-plaintiff/appellee, Whitson Kimbrow, which the Court has considered and concludes should be denied.

It is so ORDERED.

876 S.W.2d 818

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Court of Appeals of Tennessee, Eastern Section.
FOREST INC. OF KNOXVILLE, Plaintiff-Appellant,
v.
GUARANTY MORTGAGE COMPANY, INC.,
Defendant-Appellee.

Oct. 23, 1975.
Certiorari Denied by Supreme Court March 8, 1976.

Developer and seller of lots to contractor, who was unable to complete house construction, brought action against construction lender which foreclosed on deeds of trust, to which developer's deed of trust had been subordinated, based on failure of lender to control advances to contractor and to make the necessary inspections. The Chancery Court, Knox County, Federick D. McDonald, Chancellor, entered a judgment in favor of the lender and the developer appealed. The Court of Appeals, Davis, Special Judge, held that the custom in area of construction lender advancing funds to contractor in not substantially greater proportions than advance bore to the stage of completion of construction at time of particular advance was not so imperative and compulsory as to be binding in law or constitute consideration for implied contract between developer and lender, and lender owed no duty to developer to follow custom in advancing funds.

Affirmed.

West Headnotes

[1] Contracts ⟶186(1)
95k186(1) Most Cited Cases

[1] Contracts ⟶308
95k308 Most Cited Cases
Where a custom is not involved or if existing custom is not binding, advances of construction funds to a builder are in discharge of lender's contract, and in absence of express contractual provision to see to the application of funds there is neither an obligation nor duty to do so for those creditors subordinate.

[2] Contracts ⟶54(1)
95k54(1) Most Cited Cases

[2] Customs and Usages ⟶10
113k10 Most Cited Cases
Custom in area that construction lender would give funds to borrowing contractor secured by deeds of trust which were made a first lien on property by developer's execution of a subordination agreement and that construction lender was not to advance funds to contractor in substantially greater portion than advancement bore to stage of completion at time of particular advance, usually made after periodic inspections, was not so imperative as to be binding or constitute a consideration for implied contract between lender and developer, so that lender owed developer no duty to follow custom in advancing funds to contractor.

[3] Customs and Usages ⟶10
113k10 Most Cited Cases
Where custom or usage is involved in dealings between parties, plaintiff basing right to recover on breach of contract cannot recover by proof of usage and no proof of contract or by proof of custom and no proof of contract.

[4] Contracts ⟶9(1)
95k9(1) Most Cited Cases
[4] Contracts ⟶15
95k15 Most Cited Cases
[4] Contracts ⟶54(1)
95k54(1) Most Cited Cases
The essential elements of contracts, express and implied, are, among others, a meeting of minds and mutual assent to its terms which is founded on sufficient consideration and is sufficiently definite.

*853 W. Keith McCord, Knoxville, for plaintiff-appellant; Egerton, McAfee, Armistead, Davis & McCord, Knoxville, of counsel.

E. Bruce Foster, Ronald C. Koksal, Knoxville, for defendant-appellee; Frantz, McConnell & Seymour, Knoxville, of counsel.

OPINION
DAVIS, Special Judge.

The parties will be referred to as they appeared in the trial

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Court, plaintiff and defendant, as indicated above.

**\*854** By its complaint plaintiff avers defendant is indebted to it in the sum of $26,550.00, the sum of certain notes constituting the balance of the consideration for building lots it sold to Dean Cate, the notes being secured by Cate's deed of trust on said lots.

Plaintiff alleges there was an accepted practice custom and policy in the area that a land developer, such as plaintiff, sells lots to a contractor, such as Cate, who borrows money from a construction lender, such as defendant, to finance the construction of buildings on the lots; that the lender obtains a deed of trust from the contractor to secure its loan, which deed of trust is recorded prior to the developer's deed of trust, or failing in that, the lender takes a subordination agreement from the developer giving the construction lender a prior lien over the developer's deed of trust; that during the construction of the buildings the lender agrees to advance funds to the contractor at certain stages of construction in sums substantially on a ratio equal to the percentage of completion after the lender inspected the construction; that part of the custom was for the lender to inspect the construction, not over-advance funds to the contractor thereby protecting the interests of suppliers, materialmen, the developer and all having an interest, monetary in nature.

Plaintiff alleges that it did subordinate its indebtedness owed it by Cate to deeds of trust and notes of defendant so defendant would, and did, furnish construction funds to Cate. It asserts that defendant failed to properly inspect and supervise the construction, over-advanced funds to Cate before the buildings were completed, the funds were depleted to the point Cate could not finish the work, with the result, that defendant foreclosed under its deed of trust and kept the proceeds of the sale after advising plaintiff there were not enough funds to pay its subordinate notes in the sum of $26,550.00. It alleges it suffered the losses for which it sues because of defendant's action. Basically, as indicated in argument in open court on this appeal, the plaintiff asserts it is entitled to recover on contract, if not express, implied, that the consideration flowing from defendant to plaintiff was a duty of defendant to follow the custom existing in the industry in return for subordinating its security to that of defendant.

Pertinent parts of the defendant's answer include its denial of the existence of a practice or custom that construction lenders inspect the construction to protect the seller of the lots, the developer, but that such inspection was solely for its own protection, not for benefit of others with whom it had no contractual relationship. Defendant averred all loan commitments were made on basis of 75% Of estimated cost of land and improvements when fully completed; that its absolute policy was not to accept any security less than a first mortgage except on rare occasions it might enter into a written agreement to pay some specifically designated obligation for a builder; denies the subordination agreement was executed for consideration of the assumption by defendant of any fiduciary relationship with plaintiff and denies any fiduciary relationship ever existed between them. Defendant asserts it did not inspect the construction for benefit of the plaintiff and had no duty to do so; that its commitment to Cate was based only on estimates of cost of completion of the houses, and for only 75% Of the estimated cost of the land and completed houses, and it was never intended that defendant advance the total cost to Cate. Defendant denies it wrongfully advanced funds to Cate or indiscriminately disbursed funds to Cate or that its actions prevented Cate from finishing the work. Defendant admits Cate defaulted and that it foreclosed its mortgage after plaintiff refused defendant's tender of offer to permit plaintiff to complete the construction and thus minimize losses on plaintiff's mortgage; denies any action of defendant **\*855** caused plaintiff harm or damages or losses; denies it is obligated to plaintiff in any sum for any reason.

After a somewhat lengthy trial the trial judge held there was no contractual relationship established between the parties that would support a recovery; that no equitable relationship was shown justifying a recovery and that defendant did not estop itself from relying on plaintiff's subordination agreement. The plaintiff has appealed the dismissal of its action and assigned the following errors:

### ASSIGNMENTS OF ERROR
1. The Trial Court erred in ruling as a matter of law that the plaintiff could not recover from the defendant because there was no contractual relationship between defendant and plaintiff, notwithstanding the fact that the Trial Court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

found that there such a custom, practice and standard in the industry which had been violated by the defendant.

2. The Trial Court erred in ruling as a matter of law that the plaintiff could not recover from the defendant in equity because there was no equitable relationship between the parties and therefore. 'The custom of the trade which otherwise might control does not apply to their situation'.

It appears that the evidence establishes the following facts;

In June 1972 there existed in the housing construction and development industry in the Knoxville area a custom and practice that land developers sell lots to a contractor or builder of dwellings, taking notes for unpaid portion of the purchase price secured by a deed of trust. The contractor would then borrow money from a construction lender, giving notes secured by deeds of trust, which deeds of trust were made a first lien on the property by the execution by the developer of a subordination agreement to that effect. It was part of the custom and practice of the industry that the construction lender not advance the construction loan to the contractor in substantially greater portions than the advancement bore to the stage of completion of construction at the time of the particular advancement of money. Advances would usually be made after periodic inspections of the construction work.

The foregoing stated custom and practice was one that varied some with different construction loan lenders, particularly as to the number and dates of inspection in relation to the stage of construction. It was a custom loose, general, but usually adhered to as compared to another practice or custom in the industry which was inflexible and strictly followed and understood by developers, builders and lenders alike. This latter practice and custom was that construction loan lenders never loaned any sum unless secured by a first mortgage or lien; that the party executing a subordination agreement did so with no qualifying conditions contained in it; that unquestionably such lender held the prior security. It was also generally believed, understood and accepted in the industry that the execution of an unconditional subordination agreement did not carry with it or create on the part of such lender any duty to protect the lot seller's interest, nor did it create a fiduciary obligation on the lender to the developer which in any manner equaled or excelled the lender's first duty and right to protect its own investment.

Plaintiff owned certain sub-division lots and sold at least nine of them to Dean Cate. It took notes, secured by deed of trust, for the unpaid portion of the purchase price. It was understood between them that plaintiff would subordinate its security or lien to one that Cate would give to a construction lender from whom he would borrow money to build dwellings on the property. Cate borrowed over $200,000.00 from defendant, giving his notes and securing their payment by deeds of trust dated June 8, 1972, the latter being recorded. The loan was for *856 75% Of the estimated value of the lots and improvements when completed.

Thereafter, on June 18, 1972 plaintiff did execute an unqualified, unambiguous, unconditional subordination agreement which made defendant the holder of the first lien on said nine lots to secure defendant's loan to Cate. This was the first business transaction or dealing either party had had with the other and was consistent with the fact that such subordination agreements used in the industry did not have any limiting conditions, especially conditions governing how or when the money was to be disbursed to the borrower.

During the course of construction defendant made over-advances of money to Cate on nine occasions, a total of about $37,000.00, that is, advances in excess of what the custom and practice indicated should have been made at the time.

It appears that plaintiff believed the defendant would disburse the advancements of construction loan money in accordance with existing custom as it understood it, but made no inspection of the property itself, made no request for inspections, and no inquiry about the status of money advancements to Cate.

It appears the primary reason for the over-advancements by defendant to Cate was it having confidence in his ability, integrity and experience to complete buildings, to give Cate a better opportunity to complete the houses in spite of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

losses of material on the site stolen from Cate. Certainly there is no evidence that defendant's actions were intended to mislead or defraud anyone, nor that it thought that the result would inevitably be a loss suffered by plaintiff or others. Defendant apparently acted in this regard as business prudence would dictate, that is, try to protect its own interest, although it had no desire to further impair the financial interest of less secure creditors of Cate.

Whether Cate suffered so much loss of material on the site from theft, or the increase of cost of materials and labor after he began construction, or the dramatic surge of inflation generally brought about his inability to complete the construction is difficult to say. There is no evidence he used the advanced money improperly. He did fail and it was necessary for the defendant to foreclose its first mortgage after plaintiff declined an opportunity to elect to assume or pay Cate's indebtedness to defendant and attempt to save itself by other means.

The two assignments of error and the principles of law and the facts are so closely related and intertwined that they will be considered together.

In Morton v. Martin Aviation Corporation, 205 Tenn. 41, 325 S.W.2d 524, it is said:
> 'Our authorities generally hold that usages or customs of trade, to be effectively binding in law, must be imperative and compulsory in character and so well known as to affect the person to be bound with knowledge of them and raise the presumption that be dealt with reference to them.'

[1] It appears to be settled in instances where a custom is not involved, or if existing is not binding, that advances of construction funds to a builder are in discharge of the lender's contract, and in absence of an express contractual provision to see to the application of the funds, there is neither an obligation nor a duty to do so for those creditors subordinate. Kingsport Brick Corp. v. Bostwick, 145 Tenn. 19, 235 S.W. 70.

[2] We believe the custom as found to exist was not so imperative and compulsory as to be binding in law or to constitute a consideration for an implied contract, and that defendant owed plaintiff no duty to follow the custom in advancing funds.

[3][4] Where a custom or usage is involved in the dealings between parties our *857 Supreme Court has said that a plaintiff basing his right to recover upon breach of contract cannot recover by proof of usage and no proof of contract, or proof of a custom and no proof of a contract. In discussing a contract the court pointed out the several essential elements of contracts, express and implied, among which were mentioned 'a meeting of the minds in mutual assent to its terms . . . founded on sufficient consideration . . . and (be) sufficiently definite.' American Lead Pencil Co. v. Nashville, C. & St. L. Ry., 124 Tenn. 57, 134 S.W. 613.

We believe there was no meeting of the minds of the parties on a provision that the custom involved was a part of, or constituted consideration for any contract between them, express or implied; that the custom relied upon was not a part of any contract between the parties, express or implied; that defendant breached no contract with, or duty it owed to plaintiff; that defendants primary intention in its dealings with Cate was to do that which would best insure a successful completion of the buildings and their sale; that defendant exercised any and all care required of it in connection with the custom of the industry consistent with the right, reasonably exercised, to protect its own large investment.

We here quote rather extensively from the opinion of the learned Chancellor who tried this case.

'In these circumstances it must be determined what effect the custom and practice of paying in proportion to complete construction has. Plaintiff cites the following cases in support of its position: Housing Mortgage Corp. v. Allied Constr. Inc., (1953) 374 Pa. 312, 97 A.2d 802; Cambridge Acceptance Corp. v. American National Motor Ins. Inc., et al. (1967) 96 N.J.Super. 183, 232 A.2d 692; Cambridge Acceptance Corp. v. Leo Hockstein et al. (1968) 102 N.J.Super. 435, 246 A.2d 128 (138); Miller v. Citizens and Loan Association (1967) (248) Cal.App.(2d 655), 56 Cal.Rptr. 844; Middlebrook- Anderson Co. v. Southwest Savings and Loan Association (1971) 18 Cal.App.3d 1023, 96 Cal.Rptr. 338. It appears from these cases that where

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

there is an agreement or stipulation for the construction lender to supervise disbursement of funds it must do so in accord with that agreement or stipulation. Such an agreement has been found in various circumstances where the subordinating vendor and the construction lender have had dealings together in connection with the involved project. However, where the proofs do not establish some sort of dealings between the vendor and lender there appears to be no obligation from the lender to vendor with respect to advancement of constructions. This view is clearly expressed in the Hockstein case, supra, where the Court said:

> 'Yet it is the general view, recognized by respectable authority, that absent an express stipulation between the subordinator and the construction lender conditioning the scope of the subordination, diversion of the construction money by the borrower from its contemplated use will not dislodge the advanced lienor from his bargained-for priority 'in the absence of collusion with the mortgagor in diverting the money from its purpose.' IV American Law of Property, s 16.106D, p. 218 (1952; A. James Casner, Editor); 1 Jones on Mortgages, s 742, p. 1105 (1928); Note, 42 Yale L.J. 980, 982 (1933); Booklyn Trust Co. v. Fairfield Gardens, 260 N.Y. 16, 182 N.E. 231 (Ct.App.1932); Gill v. Mission Savings & Loan Association, 236 Cal.App.2d 753, 46 Cal.Rptr. 456 (D.Ct.App.1965); Matthews v. Hinton, 234 Cal.App.2d 736, 44 Cal.Rptr. 692, 697 (D.Ct.App.1965); Iowa Loan & Trust Co. v. Plewe, 202 Iowa 79, 209 N.W. 399 (Sup.Ct.1926), commented on in 12 Iowa L.Rev. 201, 203 (1927); Anglo-American Savings & Loan Association v. Campbell, 13 App.D.C. 581, 43 L.R.A. 622 (1898).
>
> Where, however, the construction mortgage expressly agrees with the subordinator to see to it that the proceeds of his *858 loan will be applied to construction of the improvement he will be held to his agreement and will lose his priority as to any advance not going into the construction. Albert & Kernahan v. Franklin Arms, 104 N.J.Eq. 446, 146 A. 213 (E. & A.1929); Joralman v. McPhee, 31 Colo. 26, 71 P. 419 (Sup.Ct.1903); see Wayne International Building & Loan Association v. Moats, 149 Ind. 123, 48 N.E. 793 (Sup.Ct.1897).'

Notwithstanding, its conclusion that there was no express agreement the Court in the Hockstein case decided on equitable principles that the lender had an obligation to see that construction funds went into the intended construction. The Court said:

> 'While, under general principles of mortgage subordination law outlined above, a construction lender taking the benefit of a subordination is not a guarantor to the subordinator or liable to him for mere negligence in seeing to the appropriation of the moneys to the construction, we think plain principles of equity at least call for such a construction lender to make and administer the loan in the conventional manner of a construction lender rather than mask what is essentially a loan on the general credit and reliability of the borrower and the security of the land value as a construction loan, and act accordingly in disbursing the funds. We are firm in the conclusion, and so find, that the latter is what the First National did here, and in violation of the owner's equitable rights.'

In the Hockstein case First National, the lender, made no effort at all to administer its loan as a construction loan, and there was virtually no attempt at all to see that the loan funds advanced went into the construction. Under these circumstances the Court held that lender equitably estopped to assert the subordination.

Whether the theory be contractual in nature or equitable, the cases recognizing or holding that the lender cannot take advantage of the land seller's subordination have involved situations where there has been some sort of dealings between the lender and land seller. If the basis is contractual, the lender must be shown to have agreed in some manner to the subordination in connection with a construction contract under circumstances which permit a finding that the lender was obligated to supervise loan distribution. If the basis is equitable, the parties must be shown to have engaged in some dealings in circumstances wherein the lender led the subordinating seller to believe the lender would advance loan proceeds in a manner contrary to that which later happened.

Here Plaintiff relies on a custom of the trade with respect to loan advances which has been found to exist. However, a custom of the kind here involved does not itself create a contract or an equitable relationship. A custom of the trade

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

explains or gives meaning to dealings between parties. Generally, where there have been no dealings between the parties, a contractual or equitable obligation cannot arise and in such circumstances there is no legal relationship to which a custom or useage may apply. Thus the Supreme Court said in American Lead Pencil Co. v. Nashville, C. & St. L. Ry. (1911) 124 Tenn. 57, 134 S.W. 613:

> 'We cannot bring ourselves to the conclusion that a bill, which bases the complainant's rights to recover upon the breach of a contract, can be sustained by proof of a usage and no proof of a contract, or proof of a custom and no proof of a contract.'

In this case it has not been shown that the parties had any dealings from which an agreement might be found. About all that happened was that Plaintiff subordinated its security to Defendants' interest. There was no showing of any further dealings between the parties. Thus there was no contractual arrangement to form a basis for Plaintiff's claim. Similarly, Defendant was not shown to have dealt with Plaintiff in *859 such a manner as to affirmatively mislead Plaintiff as to the manner in which it would disburse loan funds. In the Hockstein case the parties took part in establishing the financing arrangements and then the lender totally failed to see that the loan funds went into the construction as to which the seller subordinated. In the present case the Defendant advanced funds as construction proceeded, apparently believing they were going into the construction. The proofs do not establish that the funds did not go into the construction, merely that they were advanced too soon. It may be that some funds were not used in homes, but as far as the proofs are concerned this is not established. It may be that escalating labor and material costs made the funds advanced inadequate to pay for all the costs of construction. The proofs do not show a mispayment or diversion of funds by Defendant that were contrary to anything Defendant may have represented to Plaintiff. Defendant did nothing to equitably estop itself from relying on Plaintiff's subordination document. Thus, Defendant not having dealt with Plaintiff so as to establish a contractual or equitable relationship between the parties, the custom of the trade which otherwise might control does not apply to their situation. It is concluded that Plaintiff may not recover against Defendant.'

The assignments of error are overruled, the judgment of the Trial Court is affirmed. Plaintiff-appellant is taxed with cost of the cause.

SANDERS, J., and LUKE M. McAMIS, Special Judge, concur.

534 S.W.2d 853

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.